1  KILPATRICK TOWNSEND & STOCKTON LLP

2  ROGER L. COOK (State Bar No. 55208)
   ROBERT D. TADLOCK (State Bar No. 238479)
3  SARA B. GIARDINA (State Bar No. 278954)
   Two Embarcadero Center Eighth Floor
4  San Francisco, CA  94111
   Telephone:   (415) 576-0200
5  Facsimile:    (415) 576-0300
   Email: rcook@kilpatricktownsend.com
6          rtadlock@kilpatricktownsend.com
           sgiardina@kilpatricktownsend.com
7
   Attorneys for Defendant
8  SIDENSE CORP.

9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13

   KILOPASS TECHNOLOGY INC.,          Case No. CV 10-02066 SI
14
              Plaintiff,              **SIDENSE CORP.'S RENEWED MOTION
15                                    FOR ATTORNEYS' FEES**

        v.                            Date:  August 1, 2014
16                                    Time:  9:00 am
   SIDENSE CORP.,                     Ctrm.:    10, 19th Floor
17                                    Judge:     Hon. Susan Illston
              Defendant.
18

19

20

21

22

23

24

25

26

27

28



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES
CASE NO. C10-02066 SI

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     DISCUSSION ....................................................................................................3

        A.      Procedural Background .........................................................................3

        B.      The Supreme Court's Decision in *Octane* Changed the
                Standard for Awarding Attorneys' Fees Under 35 U.S.C. §
                285 ........................................................................................................5

        C.      Facts .....................................................................................................6

        D.      Argument ............................................................................................13

                1.      Exceptional Case ....................................................................13

                2.      Kilopass' Motives ..................................................................13

                3.      Kilopass' Patent Infringement Claims Were
                        Exceptionally Meritless .........................................................14

                4.      Subjective Bad Faith/Recklessness ........................................18

                5.      Compensation and Deterrence ................................................23

                6.      Litigation Conduct .................................................................24

                7.      Relief Requested ....................................................................24

III.    CONCLUSION .................................................................................................24



# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Classen Immunotherapies, Inc. v. Biogen Idec*,
  CIV. WDQ-04-2607, 2014 WL 2069653 (D. Md. May 14, 2014) ............................................... 6

*Comark Communications, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1995) ............................................................................................... 20

*Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*,
  246 F.3d 1336 (Fed.Cir.2001) .................................................................................................. 20

*Festo Corp. v. Shoketsu Kogyo Kabushiki Co.*,
  535 US 722 (2002) ........................................................................................................... 16, 17

*Fogerty v. Fantasy*,
  510 U.S. 517 (1994) ................................................................................................................. 20

*Home Gambling Network Inc., v. Piche*,
  2014 WL 2170600 (D. Nev. May 22, 2014) ............................................................................... 6

*Hydranautics v. Filmtec Corp.*,
  70 F.3d 533 (9th Cir. 1995) ...................................................................................................... 19

*Intellect Wireless, Inc. v. Sharp Corp.*,
  2014 WL 2443871 (N.D. Ill. May 30, 2014) ............................................................................... 6

*Johnson & Johnston Assocs. Inc. v. R.E. Service Co.*,
  285 F.3d 1046 (Fed. Cir. 2002) (*en banc*) ............................................................................... 22

*Kilopass v. Sidense*,
  738 F.3d 1302 (Fed. Cir. 2013) ........................................................................................ *passim*

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
  2014 WL 2440867 (S.D.N.Y. May 30, 2014) .............................................................................. 5

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
  572 U.S. __, 134 S.Ct 1749 (2014) ................................................................................ 5, 6, 13

*Read Corp. v. Portec, Inc.*
  970 F.2d 816 (Fed. Cir. 1992) .................................................................................................. 20

*In re Seagate*,
  497 F.3d 1360 (Fed. Cir. 2007) (en banc) ................................................................................. 20



**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

*Toro Co. v. White Consolidated Industries*,
    383 F.3d 1326 (Fed. Cir. 2004)..............................................................................23

*United States v. Cheung Kin Ping*,
    555 F.2d 1069 (2d Cir.1977)..................................................................................19

**Statutes**

35 U.S.C. § 285 ................................................................................................*passim*

**Other Authorities**

Local Rule 3-1 and 3-2...............................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that Defendant Sidense Corp. ("Sidense") hereby moves the Court for an order awarding Sidense its attorneys' fees and non-taxable costs under 35 U.S.C. § 285. This motion is noticed to be heard before Judge Susan Illston at 9:00 a.m. on August 1, 2014, in Courtroom 10 at 450 Golden Gate Avenue, San Francisco, CA 94102. This motion is based on the Points and Authorities below, the declarations filed herewith in support, the existing record in this case, any matter of which this Court takes judicial notice, and any evidence and argument presented at the hearing.

## I.   INTRODUCTION

Kilopass has outmaneuvered the patent system – exploiting a system intended to encourage and protect competition through innovation to instead thwart innovative competition.  Kilopass has taken advantage of the nexus of complex patent laws, multimillion dollar defense costs, and customer fear of becoming involved in patent litigation. And it has exploited this anomaly by suing its startup competitor Sidense for infringement of inapposite patents on technology never used by Kilopass and then publicizing the lawsuit to Sidense's customers, potential customers and companies whose products might embody the Sidense technology.

Sidense has successfully commercialized a memory cell technology that Kilopass considered and rejected as defective and neither commercialized nor patented because it was substantially larger than the memory cells of Kilopass' 1.5T commercial technology. However, what Kilopass overlooked is that despite its larger memory cell size, memory arrays utilizing the larger memory cells use far less peripheral circuitry and, therefore, occupy substantially less die area than Kilopass' memory arrays.

Kilopass' asserted patents are directed to its never-used "1T" memory cell technology, with a stated objective to achieve memory cells substantially smaller than the memory cells of Kilopass' commercial 1.5T technology. Each of the claims of these patents is limited to memory cells having "first and second doped semiconductor regions," and a specific wordline/bit line configuration. Kilopass sued Sidense for infringement of these patents despite having known for



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES          - 1 -
CASE NO. C10-02066 SI

1  more than four years that Sidense's memory cells were substantially larger than the memory cells

2  of Kilopass' 1.5T technology, that Sidense's memory cells did not have a "first doped region" and

3  that Sidense employed the exact opposite wordline/bitline configuration.

4  By asserting these patents, Kilopass was not attempting to protect its own technology, but

5  was attempting to stretch patents on a never-used technology to try to cover a technology that

6  Kilopass itself had considered and rejected. Moreover, internal Kilopass documents revealed that

7  Kilopass' intention in suing Sidense for patent infringement was to "take out" its only significant

8  antifuse memory technology competitor so as to achieve a "virtual monopoly."

9  Kilopass' CEO knew from personal experience that even a meritless patent infringement

10  lawsuit asserted against a startup like Sidense would cause it substantial harm.  He knew that the

11  multimillion dollar cost of defending a bet-the-company patent infringement lawsuit would cripple

12  a start-up like Sidense.  He knew customers would shy away from doing business with a patent

13  infringement defendant to avoid any possibility that they or their customers might become

14  embroiled in patent infringement litigation and/or liable for patent infringement damages.

15  Consequently, it is not surprising that there is no evidence that Kilopass reasonably relied upon

16  competent advice as to possible infringement by Sidense in pursuing its patent infringement

17  claims.

18  Even though Kilopass lost the lawsuit, the litigation has materially benefited Kilopass and

19  substantially harmed Sidense. In its press release issued two days after the Federal Circuit

20  affirmed this Court's judgment of noninfringement, Kilopass announced that despite its "legal

21  setback," it had record revenues and was expanding its product line, and its fortunes have

22  increased onward and upward. By comparison, despite having had a promising future at the time

23  Kilopass filed its patent infringement lawsuit, Sidense now struggles to recover. Although the

24  cloud of potential infringement liability has been lifted, customers who rejected Sidense in favor

25  of Kilopass technology as a result of the litigation are now "locked in" to the Kilopass technology

26  due to the high cost of switching technologies.  Kilopass was able to achieve this result by the

27  simple expedient of asserting and publicizing meritless patent infringement claims against a

28  startup competitor to force it to divert precious venture-capital funds to patent infringement



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                    - 2 -
CASE NO. C10-02066 SI

defense, and away from advancing Sidense's competitive position in the marketplace, as needed to keep its technology up to date as semiconductor technology moved inexorably forward.

Kilopass wishes to defend itself on the basis of its pre-filing activities, but rather than absolve Kilopass, that evidence only confirms the exceptional circumstances of this case. Kilopass' patent counsel informed Kilopass' managers that Sidense did not literally infringe Kilopass' patents and that Sidense had redesigned its cell to avoid infringement.  Although the pre-filing activities also included a "preliminary" infringement analysis in which patent litigators at the Morrison Foerster ("MoFo") firm suggested that Kilopass might have a meritorious claim for infringement by equivalence, Kilopass instructed MoFo to stop work on finalizing its infringement analysis within eight days after learning that such an analysis was in process. Moreover, the MoFo patent litigators' equivalency analysis was based upon an illogical technical theory ("channel stop") to which no technical expert ever subscribed and which Kilopass' paid technical expert abandoned and repudiated in his expert deposition. Kilopass' CTO also conducted a forensic analysis consisting of photographs of a semiconductor device embodying Sidense's memory technology, but this showed no more than that Sidense did not employ a "first doped region."

In sum, Kilopass' patent infringement lawsuit was exceptionally meritless, recklessly conducted, motivated for all the wrong reasons and, at the end of the day, cries out for both restorative compensation to Sidense and for a message from this Court intended to deter similarly abusive patent infringement lawsuits in the future.

## II.    DISCUSSION

### A.    Procedural Background

After granting Sidense summary judgment of noninfringement on all three of Kilopass' asserted patents, and after dismissing Kilopass' business tort claims with prejudice shortly before trial, the Court denied Sidense's motion for attorneys' fees under 35 U.S.C. § 285, finding that Sidense had failed to prove "by clear and convincing evidence" that Kilopass had brought or maintained the prosecution of its patent infringement "in bad faith." The Court found that Kilopass

1    had "performed substantial prefiling investigation" and was "able to obtain opinions from two

2    different law firms that Kilopass had a non-baseless claim against Sidense" and that "Kilopass'

3    Chief Technology Officer performed his own independent analysis based on the results of an

4    outside intellectual-property forensics firm to determine that a patent-infringement suit was

5    appropriate." Sidense appealed.

6          The Federal Circuit vacated and remanded the order denying Sidense's attorneys' fees.

7    First, the Federal Circuit said that a wide variety of proofs can provide the requisite showing of

8    bad faith under § 285, which must be assessed in light of the totality of the circumstances. For

9    example, "like a plaintiff seeking to recover attorneys' fees under § 285 based on alleged willful

10   infringement, a defendant need only prove reckless conduct to satisfy the subjective component of

11   the § 285 analysis." *Kilopass v. Sidense*, 738 F.3d 1302, 1310 (Fed. Cir. 2013). Moreover, the

12   Federal Circuit ruled that objective baselessness alone can create a sufficient inference of bad faith

13   to establish exceptionality under § 285 unless the circumstances as a whole show a lack of

14   recklessness. *Id.* at 1314. The Federal Circuit also held:

15             The primacy of objective evidence over assertions of subjective good
               faith or lack of knowledge is well-established in our §285 case law.[]
16             The totality of the circumstances does include an evaluation of
               subjective good faith, but mostly as a negative. If a smoking gun is
17             found, revealing that a patentee knew that he had no chance of
               winning the lawsuit, then subjective bad faith is easily shown. But
18             one's misguided belief, based on zealousness rather than reason, is
               simply not sufficient by itself to show that a case is not exceptional in
19             light of objective evidence that a patentee has pressed meritless
               claims. Thus, we have observed that, where the "patentee is
20             manifestly unreasonable in assessing infringement, while continuing
               to assert infringement in court, an inference is proper of bad faith."
21

22   *Id*. at 1311. The Federal Circuit went on to point out that "[f]actors such as the failure to conduct

23   an adequate pre-suit investigation, vexatious or unduly burdensome litigation tactics, misconduct

24   in procuring the patent, or an oppressive purpose are factors which can be indicative of bad faith."

25   *Id.*

26         While the Federal Circuit panel commented favorably on Sidense's suggestion that the

27   *Brooks Furniture* standard should be overthrown to give the District Court discretion as to

28   whether or not § 285 attorneys' fees should be awarded, and to eliminate the "clear and



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES          - 4 -
CASE NO. C10-02066 SI

convincing" standard, the panel was constrained from doing so absent an *en banc* ruling. *Id.* at 1318. In view of the panel's favorable treatment of these issues, Sidense petitioned for *en banc* review, requesting that the Federal Circuit overrule the rigid *Brooks Furniture* in favor of a discretionary "totality of the circumstances" standard, and eliminate the "clear and convincing" standard. Tadlock Decl., Exh. 11, Sidense petition at 0005. Kilopass opposed Sidense's petition for *en banc* review, arguing that the Supreme Court was in the process of reviewing the *Brooks Furniture* standard in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 572 U.S. __, 134 S.Ct 1749 (2014), and the Federal Circuit denied the petition. Tadlock Decl., Exh. 11, Order, at 0072.

### B. The Supreme Court's Decision in *Octane* Changed the Standard for Awarding Attorneys' Fees Under 35 U.S.C. § 285

A few months later, the United States Supreme Court overruled *Brooks Furniture* in favor of a discretionary "totality of the circumstances" standard and rejected application of the "clear and convincing evidence" standard. *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 572 U.S. __, 134 S.Ct. 1749, 1758 (2014). *In Octane,* the Supreme Court held that a § 285 "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. *Id.* at 1756. District courts may now determine whether a case is "exceptional" on a case-by-case exercise of their discretion, considering the totality of the circumstances. *Id.* There is no longer any precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of considerations identified by the Court. *Id.* Citing to its decisions interpreting Copyright Law, the Court identified a "nonexclusive" list of factors that a district court may consider, including "motivation," "objective unreasonableness (both the factual and legal components of the case)" and the "need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at fn. 6. In applying *Octane*, district courts have begun awarding attorney fees to prevailing defendants. *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 2014 WL 2440867 (S.D.N.Y. May 30, 2014) (patent owner on notice of non-infringement at outset of the litigation pressed ahead without a specific theory of infringement, applying the motivation and deterrence



"prongs" of *Octane*); *Intellect Wireless, Inc. v. Sharp Corp.*, 2014 WL 2443871 (N.D. Ill. May 30, 2014) (noting that the purpose of Section 285 is not to punish the losing party, but rather, to compensate the prevailing party for the costs incurred due to the losing party's unreasonable conduct, citing *Octane* and *Kilopass*); *Classen Immunotherapies, Inc. v. Biogen Idec*, CIV. WDQ-04-2607, 2014 WL 2069653 (D. Md. May 14, 2014) (patent owner pressed ahead despite receiving declarations that defendant did not make, use, or sell the accused products during the relevant time period, noting that "[a] party has an obligation not to assert baseless infringement claims 'and must continually assess the soundness of pending infringement claims during litigation.'"); *Home Gambling Network Inc., v. Piche*, 2014 WL 2170600 (D. Nev. May 22, 2014) (attempted recapture of disclaimed claim scope was unreasonable and weighed in favor of exceptionality).

Additionally, the Supreme Court cited the Federal Circuit's *Kilopass* decision with favor as to its holdings that "a defendant need only to prove reckless conduct to satisfy the subjective bad faith" and that courts may "draw an inference of bad faith from circumstantial evidence thereof when a patentee pursues claims that are devoid of merit," *Octane*, 134 S.Ct. at 1754. "Most importantly," the Supreme Court said, "the Federal Circuit stated that 'objective baselessness alone can create a sufficient inference of bad faith to establish exceptionality under § 285, unless the circumstances as a whole show a lack of recklessness on the patentee's part.'" *Id.*, fn. 4. "[A] case presenting *either* subjective bad faith *or* exceptionally meritless claims may now sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 9.

### C.    Facts

Most of the relevant facts have been established in prior decisions. *See* this Court's August 16, 2012 Order Granting Defendant's Motion for Summary Judgment of Non-Infringement (Dkt. No. 272) [Tadlock Decl. Exh. 3 at A8836-52] and the Federal Circuit's December 26, 2013 decision vacating and remanding the order denying Sidense's motion for attorneys' fees. Tadlock Decl. Exh. 2. For convenience, pages from the Joint Appendix referred to in that opinion are provided at Tadlock Decl. Exh. 3.



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES
CASE NO. C10-02066 SI

- 6 -

1    Sidense and Kilopass are competitors in the embedded non-volatile memory ("NVM")

2    market. *Kilopass*, 738 F.3d at 1304. The patents-in-suit all relate to programmable memory cells

3    and arrays of such cells. *Id*. (Tadlock Decl., Exh. 3 at A8837)[1]. The programmable memory cells

4    are comprised of a transistor located at the cross point of a column bit line and a row wordline. *Id*.

5    The transistor has a gate formed from the column bit line and a source diffusion connected to the

6    row wordline. *Id*. The drain diffusion is left "floating," i.e. not connected to an electrical source.

7    The patented memory cell is intended to be smaller than the memory cell of Kilopass' prior art

8    1.5T patents. Tadlock Decl., Exh. 3 at A8849 and Exh. 9 at 14-16; Tadlock Exh. 3 page A95, e.g.

9    at 5:5-26.  Kilopass has never denied the substantial size difference.

10    All asserted claims of the patents require (1) a "row wordline" connected to the "second

11    doped semiconductor region" and (2) "first and second doped semiconductor regions" that are (3)

12    "in a spaced apart relationship." *Kilopass*, 738 F.3d at 1305 (Tadlock Decl., Exh. 3 at A8840).

13    However, Sidense's 1T-Fuse cells embody a shallow trench isolation ("STI") region instead of a

14    first doped region (*Id*., at A8845), and connect the second doped region to the column bit line, not

15    the row wordline. *Id*. (Tadlock Decl., Exh. 3 at A8845). These differences formed the basis for this

16    Court's summary judgment of non-infringement which concluded that Sidense's accused memory

17    cells did not include any of the aforesaid three claim elements, which the Federal Circuit

18    summarily affirmed. *Id.* (Tadlock Decll, Exh. 3 at A8842-46). Having granted summary judgment

19    on three claim elements, the Court understandably declined to rule on the fourth ("transistor")

20    claim element, also present in all claims.  *Id.* at fn. 10.

21    In 2005, Kilopass's founder and an inventor on all three of the patents, Jack Peng,

22    reviewed a Sidense international patent application directed to protecting Sidense's competing 1T-

23    Fuse memory cell. *Kilopass*, 738 F.3d. at 1305 (Tadlock Decl. Exh. 3 at A10578). Peng believed

24    that the 1T-Fuse was similar to Kilopass's patented cells, except that Sidense used a split gate

25    implementation. *Id*. Peng contacted Perkins Coie patent attorney Chun Ng to discuss potential

26    infringement. *Id*. In emails to the Perkins attorney, copied to Kilopass' CEO Bernie Aronson and

27

28    [1] The parenthetical refers to the portion of the Joint Appendix cited by the Federal Circuit in its opinion.



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                    - 7 -
CASE NO. C10-02066 SI

1   CTO Harry Luan, Peng explained that "[Kilopass] did not file [a] dedicated patent for this split

2   gate implementation" and that "we should [have] … a long time ago even though we were very

3   busy." *Id.* (Tadlock Decl., Exh. 3 at A10576, A10578, A70580). According to Peng, it was not a

4   priority to Kilopass at that time because Sidense's "split gate [memory cell] is not self-aligned, *so*

5   *their practical cell size will be larger than [Kilopass's] 1.5T cell.*" *Id.*

6          Nonetheless, the Perkins attorney sent a letter advising Sidense that it "should be interested

7   in obtaining a license to Kilopass's patents" or otherwise "provide [Kilopass] with an explanation

8   of how these products avoid the claims" of the patents-in-suit. Sidense responded on January 20,

9   2006 stating that "no products produced by Sidense … fall within the scope of the claims," noting:

10              [E]ach [claim] require[s] that the transistor have (1) *first and second*
                *doped semiconductor regions* … and (2) *a second doped*
11              *semiconductor region connected to the row wordline.* … Such
                elements are not present in Sidense's memory cell transistors. For at
12              least these reasons, … we do not believe that any license of these
                patents is necessary.
13
    *Id.* (Tadlock Decl., Exh. 3 at A10590 (emphases added)).
14
           After reviewing Sidense's response, the Perkins attorney sent the following email to Peng
15
    and Kilopass's CEO:
16
                Here is my report on Sidense's response to our charge of
17              infringement. I still believe given our knowledge of Sidense's
                technology, that they infringe our patents. Please keep in mind that I
18              am assuming that their memory design is the same as detailed in their
                patent application. … Note that it is possible that Sidense may have
19              changed their memory design to be different from what is shown. …
                In speaking with Jack [Peng] earlier today, we speculated that Sidense
20              may have eliminated the first doped region and replaced it with a
                shallow trench isolation [STI] of some sort. … *[I]f in fact they have*
21              *eliminated the first doped region, then they would NOT infringe our*
                *claims literally. If that is the case, then we would have to go through*
22              *a "reissue" proceeding in the patent office* that may take 2 years in
                order to modify our first doped region. … *The most crucial bit of*
23              *information we need to find out is the design of their memory cell. We*
                *have been … assuming that their patent application shows their*
24              *memory cell. This is not always the case and it would be good if we*
                *could find out definitively how their memory cell is constructed. I still*
25              *feel strongly about our case if they are using the memory cell*
                *described in their patent application.*
26
    *Kilopass*, 738 F.3d. at 1305-6 (Tadlock Decl., Exh. 3 at 10601) (upper case emphasis in original,
27
    italics emphasis added). As the Federal Circuit observed, that email made clear that the Perkins
28



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                    - 8 -
CASE NO. C10-02066 SI

attorney's analysis up to that point was based on the assumption that the design of Sidense's 1T-Fuse cell was the same as the cell detailed in Sidense's international patent application; and (2) if that assumption was incorrect and Sidense had in fact replaced the first doped region (*i.e.* the drain) with an STI region, then Sidense "would NOT infringe [the] claims literally." *Id.* In June 2007, once Kilopass confirmed that Sidense had replaced the drain with an STI, the Perkins attorney then sent the following email to Kilopass officials: "my preliminary review of all the Sidense materials indicates that *they have redesigned their memory cell to avoid infringement of our patents. Or at least make our case much tougher." Kilopass*, 738 F.3d. at 1306 (Tadlock Decl., Exh. 3 at A10604 (emphasis added)).

Despite the Perkins attorney's advice, rather than seek reissue in the PTO, Kilopass interviewed patent litigation counsel at MoFo. On March 19, 2008, counsel from MoFo emailed Kilopass's CEO the following:

> As we mentioned during the meeting, assuming Sidense's NVM product uses … [an] STI region[] (as opposed to two N+ regions) to define the channel below the gate … *Kilopass appears to have a valid claim that Sidense's NVM product is at least the "equivalent" to the invention claimed by claim 1* of Kilopass's '751 patent, and therefore that Sidense infringes that patent.
> As we also discussed, *the next step is for us to conduct a more detailed investigation and analysis to confirm our initial impressions*, which you asked us to complete before your April 2 meeting with Kilopass's Board.

*Id.* (Tadlock Decl., Exh. 3 at A11487 (emphasis added)), whereupon MoFo began its "more detailed investigation." *Id.* However, on March 27, 2008, Kilopass instructed MoFo to stop all work on the project. *Kilopass*, 738 F.3d. at 1307 (Tadlock Decl., Exh. 3 at A11490). The reason is unclear, but MoFo subsequently sent Kilopass an invoice for 44 hours of work "relating to Kilopass's investigation of potential infringement claims against Sidense." *Id.* (Tadlock Decl., Exh. 3 at A11490). The invoice was accompanied by a "preliminary infringement chart for the '751 patent reflecting [MoFo's] analysis." *Id.*

The preliminary infringement chart provided an analysis concerning the doctrine of equivalents, stating that "Kilopass appears to have a reasonable argument that Sidense's field oxide region is equivalent to the doped region in claim 1 of the '751 patent, and therefore satisfies this limitation." *Id.* (Tadlock Decl., Exh. 3 at A11497). With regard to literal infringement, the



MoFo Counsel also opined:

> [I]f "doped region" is defined as an area on the semiconductor where the electrical properties have been changed, it may be difficult to argue that the field oxide region is a doped region.… If, however, "doped region" could reasonably be defined more broadly as simply an area to which a dopant is applied, then we may be able to argue that the field oxide region is a "doped region." Determining the potential viability of this argument will require additional investigation, technical feedback from Kilopass and possibly input from an independent expert."

*Id.*

As the Federal Circuit panel observed, although MoFo's preliminary infringement chart opined favorably to Kilopass regarding the doctrine of equivalents, there is no evidence in the record that MoFo's analysis was complete at that time, nor is there any evidence that Kilopass considered MoFo's preliminary infringement chart in deciding to bring suit against Sidense. *Kilopass*, 738 F.3d. at 1307. Moreover, there is no evidence that Kilopass informed MoFo about Mr. Ng's opinions or Mr. Peng's statements. Although Kilopass retained MoFo to prepare an infringement analysis, it terminated that relationship only eight days later. *Id.* As the panel further observed, it does not appear that Kilopass was aware of how much work MoFo had done up to that point or that MoFo was even in the process of completing an infringement chart. *Id.* In other words, the panel said, it appears that Kilopass officials had already set their mind prior to learning of MoFo's infringement analysis. *Id.*

In October, 2008, Kilopass hired a new CEO, Charlie Cheng. Previously, Mr. Cheng co-founded a company called Lexra which, as it began to gain marketplace traction, was sued for patent infringement by its larger more well-established competitor MIPS. Tadlock Decl., Exh. 3 at A10608-11 at 30:18-33:17. Lexra settled because it was "running out of money" *Id.* at A10614-15 at 38:9-39:8. Lexra lost sales because MIPS publicized the lawsuit. *Id.* at A10615-17 at 39:15-41:25. To settle the lawsuit, Lexra was forced to change its business model (*Id.* at A10612-13 at 36:13-37:10), and soon dissolved. *Id.* at A10618-19 at 42:8-9; 43:1-4. In October, 2008, Mr. Cheng's first presentation to the Kilopass Board noted that Kilopass needed a "***virtual monopoly***" to grow the business, *Id.* at A10625 (emphasis added), and the "Plan for October/Q4" was "Get ready to sue Sidense." *Id.* at A10626 (emphasis added.) At the next month's board meeting, Mr.



1   Cheng's presentation noted that, if Kilopass intended to grow, it would need to "***Take out***

2   ***Sidense***." *Id.* at A10671 (emphasis added).

3       As Kilopass was making final preparations to file a complaint against Sidense nearly a

4   year and a half later, on March 25, 2010, Kilopass' CTO Harry Luan sent Mr. Cheng an email

5   stating that "as we discussed, [Dentons patent litigator] Mark [Hogge]'s team is very comfortable

6   with the reverse engineering work we did. However, *they are still analyzing the claims of our 1T*

7   *patent*. Before you get their formal analysis, I compiled two slides on our 1T patent vs. Sidense."

8   *Id.* at A11294 (emphasis added). In slides attached to the e-mail, the CTO reported that the

9   Dentons "[a]ttorneys *don't have a conclusion yet as to the reading of first doped region and STI*

10  *region*" and that their "formal analysis is in progress." *Id.* at A11296 (emphasis added). The CTO

11  also reported that the "[r]everse engineering work shows that Sidense built OTP products that use

12  exactly the same cell as disclosed in public literatures." *Id.* In other words, the CTO reported that

13  his reverse-engineering analysis revealed that Sidense had, as surmised by the Perkins attorney,

14  "in fact eliminated the first doped region" so as to "NOT infringe [the Kilopass] claims literally."

15  *Id.*  Despite the Perkins attorney's advice, the CTO opined that "[f]rom an *engineer's* perspective,

16  we believe Sidense's cell is *at least equivalent* to that claimed by Kilopass' patent 6,940,751." *Id.*

17  (emphasis added). And, despite having learned from Peng that there was a substantial size

18  difference resulting from Sidense's use of an STI rather than a doped region, his "engineer's"

19  analysis made no mention of the substantial size difference. It also ignored the MoFo channel stop

20  theory of equivalence, but propounded another unsupportable theory, i.e. that the '751 patent

21  disclosed "replacing" the first doped region with STI – an interpretation that the MoFo lawyers

22  had discouraged.  *Id.* at A11501 ("The '751 patent describes an embodiment that uses STI region

23  *in addition* to the doped regions (*see* Figure 14 and 10:9-27 of the '751 patent at A84 and A97),

24  but doesn't claim this embodiment. This should not affect Kilopass's argument, however. *The STI*

25  *region described in the 751 patent is used as a cell isolation region, where the*

26  *doped/diffusion/field oxide (STI) regions at issue here are used as the channel stops.*" (emphases

27  added).)

28



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                - 11 -
CASE NO. C10-02066 SI

1      On May 14, 2010, Kilopass filed suit against Sidense alleging infringement of Kilopass'

2   '751 patent. *Id*. at A137-253. One month later, on June 18, 2010, Kilopass filed an amended

3   complaint adding allegations that Sidense infringed the '757 and '540 patents and also adding four

4   business tort counts. *Id.* at A173-82.

5      Concurrently, Kilopass publicized its lawsuits and reexamination proceedings, (Tadlock

6   Decl. Exh. 20) and then made express and implicit threats of U.S. patent infringement against

7   Sidense's existing and potential customers (Tadlock Decl. Exh. 14), and threats of ITC and

8   Japanese patent litigation against Sidense's existing and potential customers outside the United

9   States including in Japan. Tadlock Decl., Exh. 5.

10      This combination of litigation, publicity and threats caused customers and potential

11  customers to shy away from Sidense and drove up Sidense's cost of doing business, thereby

12  depriving it of the capital needed to effectively compete against Kilopass and nearly drove Sidense

13  out of business. Wania Decl., ¶¶ 2-3.

14      During the course of the litigation, the district court learned that Kilopass was making

15  claim construction arguments to the USPTO Board of Patent Appeals and Interferences (the

16  "Board") in a concurrent *inter partes* reexamination in order to distinguish over a key piece of

17  prior art that were directly contrary to those being made to the Court. *Kilopass*, 738 F.3d at 1307-

18  08 (Tadlock Decl., Exh. 3 at A5990-91. The district court admonished Kilopass for engaging in

19  "gamesmanship." *Id.*

20      Additionally, the Court ruled that Kilopass had attempted to amend its infringement

21  contentions to advance previously undisclosed theories under the doctrine of equivalents long past

22  the applicable deadline and without the court's approval. *Kilopass*, 738 F.3d at 1308 (Tadlock

23  Decl., Exh. 3 at A8848). The district court noted that "Kilopass's assertion of a new theory of

24  equivalence is particularly inappropriate in light of evidence that *Kilopass has known for many*

25  *years that Sidense does not literally infringe its patents.*" *Id.* at fn. 8 (Tadlock Decl., Exh. 3,

26  A8848 (emphasis added)).

27      After ruling that Kilopass had disavowed claim scope and striking evidence relating to

28  Kilopass's theory of equivalence, the Court granted Sidense summary judgment of



1  noninfringement. *Kilopass*, 738 F.3d. at 1308 (Tadlock Decl., Exh. 3 at A5845). The Court

2  reasoned that Kilopass ignored "numerous differences" between the patent claims and Sidense's

3  accused products and that Peng, a named inventor on all three patents in suit, had admitted that

4  before Kilopass filed suit that Kilopass had actually considered using Sidense's design but chose

5  not to because it resulted in a larger cell size. *Id.* (Tadlock Decl., Exh. 3 at A8844).

**D.    Argument**

### 1.    Exceptional Case

8  The Supreme Court's recent decision in *Octane* holds that determining if a case is

9  "exceptional" requires consideration of the totality of the circumstances including "frivolousness,

10 motivation, objective unreasonableness . . . and the need in particular circumstances to advance

11 considerations of compensation and deterrence."  *Octane*, 134 S.Ct. 1749, 1756, fn.6. Each of

12 those factors favors compensating Sidense.

### 2.    Kilopass' Motives

14 Despite its meritless infringement position, Kilopass was motivated to use the patent

15 litigation process itself to try to "take out" Sidense, and proceeded to do exactly that by suing

16 Sidense for exceptionally meritless patent infringement claims and publicizing those claims,

17 forcing Sidense to expend precious venture capital on attorneys' fees and frightening off Sidense

18 customers to deprive Sidense of revenues.

19 Kilopass was not motivated by a desire to protect its own technology, since its founder and

20 inventor had rejected the Sidense memory cell design. Kilopass had neither commercialized nor

21 patented it because it was not self-aligned and, therefore, substantially larger than even Kilopass'

22 1.5T commercial memory cell. Kilopass was surprised when this substantially larger memory cell

23 had unappreciated benefits, i.e. a smaller overall die area. Tadlock Decl., Exh. 11, at 1. To thwart

24 Sidense, Kilopass resurrected three patents on technology that Kilopass had never used and did its

25 best to stretch the claims of those three patents to cover the Sidense technology; however, this

26 attempted expansion of its patent monopoly classically failed when this Court found non-

27 infringement of three separate claim elements present in each of the asserted claims of each of the

28 asserted patents.



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                    - 13 -
CASE NO. C10-02066 SI

1    Internal documents that Kilopass tried to recall after they were produced showed that

2    Kilopass' motive was to use the patent infringement lawsuit in order to "take out" Sidense so as to

3    obtain a "virtual monopoly." Tadlock Decl. Exh. 3 at A10625, A10671. Kilopass was heedless of

4    the lawsuit's actual merits, since it knew the litigation process itself was certain to materially harm

5    Sidense and likely to drive it out of business, especially if (as it did) Kilopass would publicize the

6    lawsuit and threaten Sidense's customers and potential customers with costly infringement

7    litigation including ITC litigation to exclude products embodying Sidense's technology from entry

8    into the United States. Tadlock Decl. Exhs. 5, 14 and 15.

9    By suing Sidense, Kilopass was not attempting to protect its own intellectual property,

10   since Sidense's technology was based upon a memory cell design that Kilopass' founder and

11   inventor had considered and rejected, and did not patent, because it was substantially *larger* than

12   Kilopass' commercial 1.5T memory cell. Instead, Kilopass argued that its never-used 1T memory

13   cell patents, whose stated object was to provide a memory cell that was substantially *smaller* than

14   Kilopass' commercial 1.5 T memory cell, and whose claims all required "first and second doped

15   semiconductor regions" and a specific wordline/bit line configuration, covered Sidense's

16   substantially larger memory cell even though it lacked a first doped region and had the opposite

17   wordline/bit line configuration – facts Kilopass had known for several years before filing its

18   lawsuit. *See* Tadlock Decl. Exh. 3 at A10576,

19             **3.      Kilopass' Patent Infringement Claims Were Exceptionally Meritless**

20   Kilopass' infringement claims were exceptionally meritless. As Kilopass had become

21   aware by 2007, and which it then confirmed again and again prior to filing its May 2010 patent

22   infringement lawsuit, Sidense did not have a "first doped semiconductor region" as required by all

23   claims of the asserted patents-in-suit.  Rather, Sidense's memory cells had a shallow trench

24   isolation ("STI") insulator in the same location. Although Kilopass sued Sidense for both literal

25   infringement and infringement by equivalence, it never had a rational theory of infringement for

26   either.

27

28



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                                      - 14 -
CASE NO. C10-02066 SI

1

        (a)      **Kilopass never had a rational theory of infringement by equivalence**

2

3

      Kilopass never had a rational theory of equivalence. For example, Kilopass served its

4

original Infringement Contentions Pursuant to Patent Local Rule 3-1 and 3-2 on January 28, 2011

5

[Tadlock Decl., Exh. 12 at 0001 (Ex. 2)], and then served *Amended Infringement Contentions* on

6

April 4, 2011 (*Id*. at 0040), each of which asserted the following "function, way, result" theory of

equivalence:

7

8

> Additionally, the STI is the equivalent of the first doped region. The function of
> the first doped region is *to provide a channel stop*. The way it functions is to
> *prevent current from the channel to flow* in the area of the STI. The result is that
> the end of the channel is defined. Sidense's STI perform substantially the same
> function, functions in substantially the same way, and achieves the substantially
> same result.

9

10

11

*Id*., *See e.g.* at 0007, 0028, 0047 and 0068 (emphasis added). However, the patent specification did

12

not teach that the function of the first doped region was to provide a "channel stop" or was

13

otherwise intended to *prevent* the flow of electrical current in the region occupied by the STI.[2]

14

      The "channel stop" theory of equivalency was exceptionally meritless. It originated in an

15

August 2008 "preliminary" infringement pitch by patent litigators at MoFo, but fell far short of

16

serving as a rational theory of equivalence. For example, Kilopass ordered MoFo to stop work

17

before it received this preliminary analysis and eight days after learning that MoFo was preparing

18

a further infringement analysis, and there is no evidence that a further infringement analysis based

19

upon the "channel stop" theory was ever prepared. And, no technical expert ever subscribed to the

20

clearly technical "channel stop" theory. Although Kilopass' CTO provided his "engineer's" theory

21

of infringement by equivalence in March 2010, his theory of equivalence was different and did not

22

endorse the channel stop theory. Tadlock Decl. Exh. 3 at A11294-96. Even though Kilopass

23

retained its paid technical expert Professor Neikirk by the time it served its infringement

24

contentions in early 2011 (Tadlock Exh. 8 at 8:15-22), it apparently did not bother to check this

25

theory with him because more than one year later he propounded an entirely different theory of

26

---

27

    [2]The patent specification does state that because the first doped region is "floating," no current
flows in it. However this does not mean that the function of the first doped region is to "prevent"
current flow. For example, if there are no zebras at your house, this does not mean that the
function of your house is to prevent the appearance of zebras.

28



1   equivalence based upon geometry, rather than electrical function.  When pressed during his

2   deposition, Professor Neikirk would not support the channel stop theory and stated that the

3   electrical properties of the first doped region were irrelevant. *Id*. at 30:5-8, 32:4-13 and 32:14-

4   35:4. Had Kilopass asked inventor Jack Peng, it would have learned that the reason for having two

5   diffusions per cell was "to make 'it a higher density.'" Tadlock Decl., Exh. 3 at A8849 at 14:24-

6   26.

7        Professor Neikirk's alternate theory of equivalence was equally meritless in both law and

8   fact. Kilopass served Neikirk's expert report on April 13, 2012 – more than one year after

9   Kilopass' original and amended infringement contentions, and after the close of fact discovery. In

10  that report, Neikirk asserted a brand new equivalence theory focused on the geometry of the cell,

11  rather than its electrical properties. *Id*. at A8847. The Patent Local Rules (P.L.R. 3-6) allow

12  amendment of infringement contentions "only by order of the court upon a timely showing of

13  good cause" (*Id*. at A8848), which showing Kilopass could not provide. Consequently, the Court

14  concluded that "Kilopass amended its infringement contentions with respect to the doctrine of

15  equivalents far past the applicable deadlines without court approval," and rejected it on procedural

16  grounds as a matter of law. *Id*. at A8847.[3]

17       The Court then found the "geometric" theory of equivalence (for "first doped

18  semiconductor") meritless on multiple other grounds. For example, the Court's Claim

19  Construction Order had defined the claim term "semiconductor" as "a material, like silicon, whose

20  conductivity is in the range *between that of metals and insulators*, and whose conductivity can be

21  altered by the introduction of an impurity" *Id*. at A8849 (emphasis added)). Consequently, the

22  Court found that "***[b]y the definition*** set forth at Claim Construction, ***a semiconductor is not an***

23  ***insulator, nor its equivalent***." *Id*. Moreover, "***Kilopass provided no evidence that insulators are***

24  ***the equivalent of semiconductors***. ***Instead, the evidence show[ed] the contrary***. *Id*. Thus, the

25  Court concluded that the uncontroverted evidence unequivocally demonstrated a non-trivial

26  difference between insulators and semiconductors. *Id. See Festo Corp. v. Shoketsu Kogyo*

27  _____

28     [3]Professor Neikirk's alternate theory never became part of the case and, as a result, even if it were reasonable (it was not), the Court should not consider it in its analysis.



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES        - 16 -
CASE NO. C10-02066 SI

1   *Kabushiki Co.*, 535 US 722 (2002) (stating that "[t]he doctrine of equivalents allows the patentee

2   to claim those insubstantial alterations that were not captured in drafting the original patent claim

3   but which could be created through *trivial* changes.") (emphasis added). *Id.* at A8849. Further,

4   instead of arguing that insulators are equivalent to semiconductors, Kilopass illogically argued that

5   the electrical properties of the "first doped semiconductor region were irrelevant." *Id*. The Court

6   found this would render the term "semiconductor" – a term defined with respect to its electrical

7   conductivity – superfluous, as would be improper under Federal Circuit precedent. *Id*.

8        The Court went on to note further that in 2005, nearly five years before filing its lawsuit,

9   Kilopass' founder and inventor of the patents-in-suit told Kilopass that he had considered

10  Sidense's memory cell design but rejected it because it was larger than Kilopass' commercial 1.5T

11  memory cell, and never sought to patent it. Tadlock Decl., Exh. 3 at A8849-50[4]. The Court noted

12  that Kilopass never disputed that the use of a "first doped semiconductor region" allowed it to

13  achieve higher density by combining the first doped semiconductor regions of adjacent cells rather

14  than use STI regions. *Id*. Moreover, at deposition, the founder/inventor stated that the reason for

15  having two diffusions per cell was because we want to make this it a higher density …." *Id*. Yet,

16  just as Kilopass ignored the definitional nonequivalence of Sidense's STI to the claimed "first

17  doped semiconductor region," the Court said Kilopass "also ignore[d] the non-insubstantial

18  difference that its use of a first doped semiconductor region, rather than an STI, renders its

19  memory cell much smaller." *Id*.

20       The Court then concluded by ruling that Kilopass' "geometric" theory of equivalence

21  attempted to avoid the numerous differences between its first doped semiconductor region and the

22  STI insulator by proposing a "function-way-result" of the first doped region claim element that

23  was overly broad and procedurally inappropriate as a material belated amendment to its

24

25       [4]Kilopass' 2008 competitor analysis of Sidense's  memory cell confirmed that Sidense's
26  memory cell array was "much larger (2X)" then a comparable Kilopass memory cell array even
    though Sidense's overall die area was 21% smaller than Kilopass' die area. Tadlock Decl., Exh. 11
27  at 1. The patents, on the other hand, distinguished prior art patents directed to Kilopass' 1.5T
    memory cell by stating that "in each of the memory cells described above, the cell size is relatively
28  large. The present invention provides a much smaller cell size, thereby showing a higher density."
    Tadlock Decl., Exh. 3 at A114 at 4:45-47. *See* Tadlock Decl., Exh. 3 at A8849.



infringement contentions made without having sought or obtained permission of the Court. *Id*. at 15.

### (b) Kilopass never had a reasonable theory of literal infringement

Kilopass' theory of literal infringement was exceptionally meritless because Kilopass never articulated, let alone supported, a reasonable theory of literal infringement. The closest Kilopass came to even articulating such a theory was in its infringement contentions, where Kilopass made the following unintelligible statement:

> The '751 patent teaches and claim one covers situations where the "drain" or first doped region is floating, i.e., no current flows through the drains. Col. 5, lines 40-43. In such events a shallow trench isolation (STI) can be used as a channel stop. In making the shallow trench isolation, the p well substrate doping is changed near the trench wall causing the well-known narrow channel effect. That area is literally a first doped region forming the channel stop. Also the STI is doped with N+ when the second doped area is formed and the N+/STI is formed in the substrate.

*See* Tadlock Decl., Ex. 12 at 0060. Kilopass never attempted to  support this theory with evidence from the patent or the patent file history, or with an expert report, or with any other evidence. Instead, in response to Sidense's motion for summary judgment of noninfringement, Kilopass conceded the absence of literal infringement. Tadlock Decl., Exh. 3 at A8846.

### 4. Subjective Bad Faith/Recklessness

The exceptional meritlessness of Kilopass' patent infringement claims and the malicious and reckless manner in which it pursued them is compelling evidence of Kilopass' subjective bad faith. For example, there is direct evidence that Kilopass' motive was to use the patent infringement litigation to "take out" Sidense in order to obtain a "virtual monopoly" rather than to protect its intellectual property rights. Tadlock Decl., Exh. 3 at A10625, A10671. And there is objective circumstantial evidence that Kilopass pursued those claims recklessly – a circumstance which the Federal Circuit has equated with subjective bad faith. *Kilopass*, 738 F.3d at 1310.

For example, although Kilopass' Perkins Coie patent attorney initially believed that Sidense's memory cell had "first and second doped semiconductor regions," (Tadlock Decl., Exh. 3 at A10583-86, A10590, and A10601), he told Kilopass that if Sidense had eliminated the first doped region, it would not literally infringe and, rather than suggest a possible claim of



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                   - 18 -
CASE NO. C10-02066 SI

1   infringement by equivalence (as he implied might be available to prove infringement by Sidense's

2   reversed wordline/bit line configuration), he suggested that Kilopass pursue a reissue application.

3   *Id.*, Exh. 3 at A10601 and A10604-05. The Perkins attorney never gave Kilopass encouragement

4   to think it could prove infringement by equivalence.[5]

5       Rather than seek a reissue, Kilopass shopped for litigation counsel, but there is no evidence

6   that it ever received advice on infringement by equivalence upon which it might have reasonably

7   relied – a failing that the Court characterized as "particularly inappropriate in light of evidence

8   that Kilopass has known for many years that Sidense does not literally infringe." Tadlock Decl.,

9   Exh. 3 at 8849 fn. 3.

10      Kilopass has argued that its patent lawsuit was not reckless because a patent litigator at

11  MoFo gave Kilopass preliminary advice in August 2008 that there might be infringement under

12  the doctrine of equivalents on the technical theory that the first doped region and the STI each

13  functioned as a "channel stop" to prevent the flow of electricity in the region occupied by the first

14  doped region. Kilopass asserted this theory in its original and amended infringement contentions

15  served on January 28, 2011 and April 4, 2011, respectively. Tadlock Decl., Exh. 12. However, it

16  was reckless for Kilopass to rely on this advice, since it was explicitly "preliminary" and Kilopass

17  had instructed MoFo to stop work after only eight days.  Moreover, Kilopass never told the MoFo

18  lawyers about its patent counsel's opinion or the inventor's statements that he considered but

19  rejected Sidense's design.

20      The mere fact that Kilopass was able to find lawyers willing to file a patent infringement

21  suit is irrelevant to this analysis. Were it otherwise, no defendant could collect legal fees under §

22  285. The Federal Circuit recognizes that the functions of opinion counsel and trial counsel are

23  significantly different. Whereas opinion counsel serves to provide an objective assessment for

24  making informed business decisions, trial counsel focuses on litigation strategy and evaluates the

25  _____

26      [5]By vacating the earlier denial of attorneys' fees, the Federal Circuit also implicitly vacated any
    underlying factual determinations as to the implications of the Perkins attorney's pre-filing advice.

27  *Kilopass*, 738 F.3d at 1312; *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 537 (9th Cir. 1995) ("If
    an appellate court reverses and vacates a judgment, the party which prevails on appeal is generally
    not bound by adverse trial court rulings on other issues. *United States v. Cheung Kin Ping*, 555

28  F.2d 1069, 1077 (2d Cir.1977).")



1    most successful manner of presenting a case to a judicial decision maker; and trial counsel is

2    engaged in an adversarial process. *In re Seagate*, 497 F.3d 1360, 1373 (Fed. Cir. 2007) (en banc)*;

3    see also Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.,* 246 F.3d

4    1336, 1352 (Fed.Cir.2001) (concluding that "defenses prepared [by litigation counsel] for a trial

5    are not equivalent to the competent legal opinion of non-infringement or invalidity which qualify

6    as 'due care' before undertaking any potentially infringing activity.")

7         Moreover, an infringer may not rely upon advice of counsel as a defense to § 285

8    attorneys' fees for willful infringement unless it can show reasonable reliance upon competent

9    advice. *See Comark Communications, Inc.  v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1995)

10   (the legal opinion must be competent or it is of little value in showing a good faith belief); *see also

11   Read Corp. v. Portec, Inc.* 970 F.2d 816,829 (Fed. Cir. 1992) (a legal opinion not competent

12   where attorney may not have looked into necessary facts). A patent owner must be held to the

13   same standard in defending against § 285 exceptional case attorneys' fees. *See Fogerty v. Fantasy*,

14   510 U.S. 517, 535 (1994) (in  awarding attorney fees under the Copyright Act, prevailing plaintiffs

15   and prevailing defendants must be treated alike).

16        Kilopass never received a competent opinion of counsel upon which it might have

17   reasonably relied. The Perkins lawyer gave only negative advice, aside from proposing reissue

18   proceedings which Kilopass did not follow. The CTO's advice was explicitly not legal advice and

19   transparently overzealous. *See, e.g., Kilopass,* 738 F.3d at 1311 ("ones misguided belief, based on

20   zealousness rather than reason, is simply not sufficient by itself to show that a case is not

21   exceptional in light of objective evidence that a patentee has pressed meritless claims). MoFo's

22   advice was explicitly preliminary and Kilopass instructed MoFo to stop work before it was

23   complete. Finally, there is no evidence that Mark Hogge ever gave Kilopass competent favorable

24   advice or, if he did, that Kilopass actually relied on any of this before filing this lawsuit.

25        Moreover, Sidense explained why its memory cell technology did not infringe the Kilopass

26   patents again and again. On January 20, 2006, Sidense's attorney Anne Kinsman told Kilopass

27   that Sidense's memory cell did not have (1) first and second doped semiconductor regions, (2) a

28   second doped semiconductor region connected to the row wordline, and (3) a gate formed from



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                    - 20 -
CASE NO. C10-02066 SI

1    one of the column bit lines. Tadlock Decl., Ex.h 3 at A10590. Then, on October 11, 2010,

2    Sidense's trial counsel Roger Cook sent Kilopass' trial counsel Mark Hogge a letter directing his

3    attention to an earlier letter dated October 6, 2010 once again explaining that Sidense's memory

4    cell lacked the foregoing three claim elements, and advising him that if Kilopass were to continue

5    pursuing its claim, Sidense would seek recovery of its attorneys' fees and costs. Tadlock Decl.,

6    Exh. 6. Again, on December 19, 2011, Sidense served its Fourth Supplemental Response to

7    Kilopass Interrogatory No. 5 which provided an elaborately detailed claim chart explaining in

8    detail the reasons why Sidense did not infringe the Kilopass patents. Tadlock Decl., Exh. 7 at

9    Exhibit D (e.g. pp. 1-9).

10       Under the circumstances, it was reckless for Kilopass to have filed and prosecuted its

11    patent infringement lawsuit against Sidense without having first obtained and reasonably relied

12    upon competent legal advice as to infringement by equivalents.  Under the circumstances, it would

13    be unjust to deny Sidense recovery of its attorneys' fees. Despite losing a lawsuit designed to harm

14    its competitor, Kilopass has accomplished exactly that and come away the winner. Under the

15    banner headline, "Kilopass Continues to Grow Despite Legal Setbacks," Kilopass' April 15, 2013

16    release announced record revenues and accelerated expansion of its product line two days after

17    losing the lawsuit. Tadlock Decl., Exh. 10.

18       Additionally, the patent does not state that the function of the first doped region is to serve

19    as a channel stop, and no technical expert ever agreed with the "channel stop" theory. Indeed,

20    although Kilopass had retained its paid technical expert Professor Neikirk in early 2011 (Tadlock

21    Decl., Ex. 8), and therefore could easily have consulted with him on this technical subject, it

22    apparently did not do so, since Prof. Neikirk never agreed with this theory and ultimately

23    repudiated it in his expert deposition after close of fact discovery. *Id.* at 30:5-8 and 32:4-13.

24    Likewise, although the Kilopass CTO offered his own "engineer's" theory of infringement by

25    equivalence in March 2010, his theory of equivalence did not include a "channel stop" theory or

26    otherwise attribute any electrical functionality to the first doped region and ignored the size

27    difference of which he was well aware.

28

SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES         - 21 -
CASE NO. C10-02066 SI

1    Kilopass knew that Sidense's memory cell did not literally infringe the Kilopass patents

2    because its Perkins Coie patent attorney had repeatedly told Kilopass' managers that Sidense did

3    not literally infringe beginning several years before Kilopass filed its patent infringement suit.

4    Tadlock Decl., Exh. 3 at A10600-01, A10604. Nonetheless, Kilopass' complaint maliciously and

5    recklessly continued to assert literal infringement until late in the case after Kilopass' expert

6    grudgingly admitted that there was no literal infringement under cross examination during his

7    deposition.

8    Kilopass also argues that its patent lawsuit was not reckless because it conducted a forensic

9    analysis of the Sidense memory cell. However, this analysis consisted of taking photographs of the

10   Sidense memory cell which only confirmed that the Sidense memory cell did not have a first

11   doped region and that there was an STI in its place – exactly the same structure that Kilopass'

12   Perkins patent attorney said did not literally infringe.

13   Kilopass finally argues that its patent lawsuit was not reckless because its CTO had opined

14   that the Sidense memory cell infringed under the doctrine of equivalents. Yet, the CTO

15   characterized his advice as only an "engineer's" theory and expressly deferred to a formal

16   infringement analysis that he said lawyers at the Dentons firm were preparing. No such formal

17   advice has ever been made of record in this lawsuit, no witness ever reported seeing it, no witness

18   ever reported relying on it, and no Dentons lawyer ever claimed to have prepared such an analysis,

19   let alone delivered it to Kilopass. Moreover, the CTO's theory ignored the MoFo patent litigator's

20   "channel stop" theory and was based upon a transparently overly zealous and strained reading of a

21   statement in the '751 patent specification which he said taught *replacement* of the first doped

22   region with an STI – a statement which the MoFo lawyer had correctly interpreted to mean use of

23   an STI *in addition* to first and second doped regions. Moreover, this analysis was by a Kilopass

24   employee who had no background in, and whose opinion demonstrated, that he did not understand

25   patent law. Had his strained interpretation been correct, the "disclosure-dedication" patent law

26   doctrine would have barred Kilopass from asserting that Sidense's use of an STI in place of a first

27   doped region resulted in infringement under the doctrine of equivalents. *See, Johnson & Johnston*

28   *Assocs. Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1052-1054 (Fed. Cir. 2002) (*en banc*) (explaining



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                    - 22 -
CASE NO. C10-02066 SI

1    why a patentee may not apply the doctrine of equivalents to cover unclaimed subject matter

2    disclosed in the specification); *see also Toro Co. v. White Consolidated Industries*, 383 F.3d 1326,

3    1331 (Fed. Cir. 2004).

4    Kilopass' maliciousness and recklessness is further evidenced by the fact that none of the

5    advice that Kilopass allegedly relied upon addressed the substantial size difference between

6    Sidense's memory cell and the patented cell, and that there is no evidence Kilopass informed the

7    firms it interviewed about either the lead inventor's statements about his failure to pursue either

8    commercialization or patent protection in view of the substantial size difference, or its patent

9    counsel's non-infringement opinion.

10                    **5.    Compensation and Deterrence**

11   "Compensation and deterrence" policy concerns call for Kilopass to compensate Sidense

12   for its attorneys' fees. Despite Kilopass' exceptionally meritless patent infringement claims, the

13   litigation profoundly harmed Sidense's nascent business – exactly as Kilopass anticipated.  It

14   forced Sidense to spend millions of dollars of precious venture-capital funds on attorneys' fees

15   rather than on continuing to advance its technology as needed to keep up-to-date with ongoing

16   technological change in the semiconductor manufacturing business.  The lawsuit drove away

17   customers and potential customers fearful of embodying potentially infringing technology in their

18   chips and in products embodying those chips, thereby depriving Sidense of expected revenue.

19   Wania Decl. at ¶¶4-7. Moreover, although the cloud of potential infringement liability has been

20   lifted, customers who rejected Sidense in favor of Kilopass technology as a result of the litigation

21   are now "locked in" to the Kilopass technology due to the high cost of switching technologies. *Id.*

22   at ¶3. As a result, despite having lost the lawsuit, Kilopass has actually benefitted greatly from the

23   legal system.  Conversely, despite resoundingly defeating Kilopass' claims, Sidense is struggling

24   to recover from successfully mounting a defense to Kilopass' claims.  *Id.* at ¶8.

25   When Kilopass filed its complaint four years ago, Sidense was a small but quickly growing

26   competitor of Kilopass.  Kilopass' lawsuit stalled that growth and, over the next four years,

27   consumed a great majority of Sidense's financial and human capital.  Sidense fought Kilopass'

28   lawsuit and won, but that victory came at a significant cost.  Compensating Sidense for the



SIDENSE'S RENEWED MOTION FOR ATTORNEYS' FEES                                              - 23 -
CASE NO. C10-02066 SI

attorneys' fees it spent is appropriate here in light of the exceptionally meritless claims, Kilopass's pernicious motivation, and the significant harm Kilopass' lawsuit caused Sidense.

### 6. Litigation Conduct

Kilopass' conduct during the litigation lays bare the lack of a coherent infringement theory. Kilopass' own paid expert could not defend, and abandoned, the infringement theory that purportedly supports Kilopass' alleged good faith belief in its infringement claims against Sidense. This Court described Kilopass' last minute change in infringement theories as "particularly inappropriate in light of evidence that Kilopass has known for many years that Sidense does not literally infringe." Tadlock Decl., Exh. 3 at A8849, fn. 8. Similarly, in what the Court characterized as "gamesmanship," Kilopass took inconsistent positions before this Court and the PTO, arguing one thing here to prove infringement and the exact opposite in the PTO to preserve the validity of its patents. Tadlock Decl., Exh. 3 at A5990-91. Moreover, as the Court noted in granting Sidense summary judgment of non-infringement, Kilopass ignored the "numerous differences" between the patent claims and Sidense's accused products." *Kilopass*, 738 F.3d at 1308 (Tadlock Decl., Exh. 3, A8849 at 14:18, 15:5 and 19). Taken together, these characterizations of Kilopass' pursuit of its infringement claims make this an exceptional case warranting an award of attorneys' fees.

### 7. Relief Requested

Sidense requests payment of its "reasonable" attorneys' fees in the amount previously requested plus an appropriate update. Sidense will submit an update following determination of the present motion.

## III. CONCLUSION

In 2006, Sidense told Kilopass that its memory cell did not have "first and second doped semiconductor regions" and did not have the same wordline/bit line configuration of Kilopass' patents. In 2007, Kilopass confirmed that what Sidense had told Kilopass was completely true. During that time, Kilopass' patent attorney told Kilopass that such a memory cell did not literally infringe Kilopass' patents and, rather than encouraging Kilopass to believe that it might have a

1  chance to overcome the absence of a first doped region, recommended that Kilopass seek to re-
2  issue its claims.

3      Kilopass nevertheless subjected Sidense to years of expensive patent litigation, while
4  simultaneously threatening the market, only to have this Court confirm what Kilopass had known
5  for years – that Sidense did not infringe.  Kilopass should compensate Sidense for the millions of
6  dollars it spent to have this Court confirm what Sidense told Kilopass the very first time Kilopass
7  raised the issue of infringement in 2006.

8

9  DATED:  June 27, 2014                  Respectfully submitted,

10                                        KILPATRICK TOWNSEND & STOCKTON LLP

11

12                                        By:    /s/ Roger L. Cook
13                                                ROGER L. COOK

14                                        Attorneys for Defendant
                                          SIDENSE CORP.
15

16  62750908 v1

17

18

19

20

21

22

23

24

25

26

27

28



66385205V.1